UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

*In Re*:                                                                   Chapter 7
                                                            Case No. 11-12805-ABC

MARTIN L. HUTCHESON, **Debtor,**

WELLS FARGO BANK, N.A., Successors, Assigns, Servicers, Investors and Trustees, **Movant.**

vs.

MARTIN L. HUTCHESON and DANIEL A. HEPNER, Trustee,   **Respondents.**

---

## MOTION FOR RELIEF FROM AUTOMATIC STAY

---

COMES NOW, Creditor, Wells Fargo Bank, N.A., its predecessors, successors, assigns, services, investors, and/or trustees ("Movant"), by and through its attorneys, Aronowitz & Mecklenburg, LLP, for its Motion for Relief from Automatic Stay pursuant to 11 U.S.C. § 362(d), and in support thereof states as follows:

1.       This Court has jurisdiction pursuant to 11 U.S.C. § 362(d), as this is related to a pending proceeding in the United States Bankruptcy Court, District of Colorado, Chapter 7 Case No. 11-12805-ABC.

2.       Debtor is not an infant, incompetent person, and is not in the United States military service. An affidavit in support of this statement is attached hereto.

3.       Debtor is the owner of certain real property legally described as follows:

LOT 32, ENGLISH RANCH SOUTH, P.U.D., SECOND FILING, COUNTY OF LARIMER, STATE OF COLORADO.

Which is known by street and number as: 2814 SUNSTONE DR, FORT COLLINS, CO 80525-5690 (the "Property").

4.       On or about September 28, 2007, Debtor, Martin L. Hutcheson, executed a promissory note ("Note") secured by a deed of trust ("Deed of Trust") encumbering the Property in the amount of $217,600.00 for the benefit of World Savings Bank, FSB.  The Deed of Trust was recorded in the official records of Larimer County, Colorado, on October 04, 2007 at Reception No. 20070075884. A true and correct copy of the Note and Deed of Trust are attached hereto.

5.      Subsequent to the execution of the Note and Deed of Trust, Movant became the owner.

6.      In order to demonstrate that Movant is the owner of the Note and Deed of Trust and has standing to bring this motion, Movant has attached a copy regarding the merger or acquisition of the company on the original note.

7.      The approximate amount due and owing to Movant, and in default, pursuant to the terms of the Note and Deed of Trust through the date of the filing of this Motion is $13,854.62.

8.      The Debtor is in default under the terms of the Note and Deed of Trust because Debtor failed to make the requisite monthly mortgage payments that were contractually due for the months of April 2010 through February 2010.

9.      The monthly mortgage payment is $1,167.06. This loan is an adjustable rate mortgage. The April 2010 through May 2010 payment amount was $1,130.07, the June 2010 through October 2010 payment amount was $1,152.49 and the November 2010 through February 2011 payment amount was $1,167.06.

10.      Additionally, late charges, advances, attorneys' fees and costs have been incurred by the Movant resulting in a total amount of $1,163.79 in fees due and owing to Movant and added to the loan pursuant to the terms of the Note and Deed of Trust.  This amount is included in the total due and owing listed in paragraph seven (7).

11.      According to the attached payment history, the last payment was received on May 14, 2010, in the amount of $1,130.07, and was posted to the March 2010 payment.

12.      The enforcement of the Note and Deed of Trust has been automatically stayed by operation of 11 U.S.C. § 362.

13.      Movant respectfully requests the automatic stay be terminated with respect to the Property pursuant to 11 U.S.C. § 362 (d)(1).

14.      According to the Statement of Intention filed by the Debtor, the Property is listed as non-surrender.

15.      According to the Debtor's Schedule A, the Debtor values the Property in the amount of $250,000.00.

16.      The amount of Movant's secured claim is $231,925.87, and it is a first lien on the Property.

17.      Thus, there is an insufficient equity cushion to provide adequate protection for the Movant.

18.     Accordingly, Movant is entitled to relief from the automatic stay because there is a lack of adequate protection of Movant's interest in the Property pursuant to 11 U.S.C. § 362(d)(1).

19.     In the event that no response is filed to this Motion, Movant requests that the Court waive the fourteen (14) day stay period pursuant to Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure.

20.     Movant has incurred reasonable attorneys' fees and costs in the amount of $700.00 for its Motion for Relief from the Automatic Stay. Movant is not seeking an administrative claim but intends to add the fees and costs to the loan pursuant to the contractual provisions contained in the Note and Deed of Trust.

21.     In addition to seeking relief from stay to pursue state remedies under the Note and Deed of Trust, Movant seeks relief to, at its option, offer, provide, and enter into loss mitigation, including but not limited to, a forbearance agreement or a loan modification. The Movant may contact the Debtor via telephone or written correspondence to offer such agreement. Any such agreement shall be non-recourse unless included in a reaffirmation agreement.

22.     In contacting the Debtor for any loss mitigation purposes, Movant intends to assist the Debtor in potentially retaining the Property, as Property for the Debtor. Movant does not intend to take any action against the Debtor, or take any action for which Movant will not obtain, or is not granted, relief from the automatic stay.

         WHEREFORE, Movant respectfully requests the entry of an order annulling and/or terminating the automatic stay with respect to the Debtor and the Bankruptcy Estate, and for such other and further relief as this Court deems proper.


DATED:  February 22, 2011.                     ARONOWITZ & MECKLENBURG, LLP


┌─────────────────────────┐
│ E-FILED ORIGINAL        │
│ Date: Feb 22, 2011      │          Susan J. Hendrick, No. 33196
│ Document to be          │          Stacey L. Aronowitz, No. 36290
│ retained in file of     │          Monica Kadrmas, No. 34904
│ Susan J. Hendrick       │          Andrea Rickles-Jordan, No. 39005
└─────────────────────────┘          1199 Bannock Street
                                     Denver, Colorado   80204
                                     Telephone: (303) 813-1177
                                     Telecopier: (303) 813-1107
                                     Email Address:  bk@amlawco.com

**Bankruptcy Payment History**

| Date Received | Contractual Date Posted To | Debtor Funds Received |
|---|---|---|
| 03/01/10 | 01/15/10 | $1,130.07 |
| 04/01/10 | 02/15/10 | $1,130.07 |
| 05/14/10 | 03/15/10 | $1,130.07 |

```
P309  LN▓▓▓▓▓▓▓▓            MORTGAGE LOAN HISTORY               02-21-11
NAME ML HUTCHESO            INV-LN ▓▓▓▓▓▓▓▓▓▓▓   DUE 04-15-10 TYPE 13-A
BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB    220,096.31  2ND PB         .00
HUD       .00  NET    1130.07  SF .00000000 SUSP      .00 STOP D B P F N A D L
REP       .00  RES       .00                             2 0 0 0 1 3 0
  APP              03-01          03-01        02-10        02-09
  DUE              01-10          01-10        01-10        02-10
  TYPE/TRAN        1   68         1   72       1   61       3   12
  AMOUNT             .00       1,130.07       183.62       934.96-
  PRIN-PD            .00         363.60          .00          .00
  PRIN-BAL    220,886.28     220,886.28    221,249.88    221,249.88
  INT-PD            .00         559.58          .00          .00
  ESC-PD         183.62-        206.89       183.62       934.96-
  ESC-BAL         23.27         206.89          .00       183.62-
  A&H-INS           .00            .00          .00          .00
  LIFE-INS          .00            .00          .00          .00
  LC/FEES           .00            .00          .00          .00
  MISC-PD           .00            .00          .00          .00
  ADV-BAL           .00         183.62       183.62          .00
  SUSP              .00            .00          .00          .00
  SC/PAYEE   *                *                           05069

PAGE 008 OF 008  **PRESS PF10 FOR 25 MONTHS**   OLDEST TRAN 02-09-10 /P
```

```
P309 LN████████            MORTGAGE LOAN HISTORY                    02-21-11
NAME ML HUTCHESO            INV-LN ████████████  DUE 04-15-10 TYPE 13-A
BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB    220,096.31  2ND PB        .00
HUD      .00  NET   1130.07  SF .00000000 SUSP        .00 STOP D B P F N A D L
REP      .00  RES      .00                               2 0 0 0 1 3 0
```

| | | | | | |
|---|---|---|---|---|---|
| APP | 03-30 | 03-02 | 03-02 | 03-01 | 03-01 |
| DUE | 02-10 | 02-10 | 02-10 | 02-10 | 02-10 |
| TYPE/TRAN | 1  52 | 1  52 | 1  73 | 1  72 | 4  93 |
| AMOUNT | .00 | .00 | .00 | 46.16 | .00 |
| PRIN-PD | .00 | .00 | .00 | .00 | .00 |
| PRIN-BAL | 220,886.28 | 220,886.28 | 220,886.28 | 220,886.28 | 220,886.28 |
| INT-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-BAL | 23.27 | 23.27 | 23.27 | 23.27 | 23.27 |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES  1 | 46.16- 1 | 46.16- 1 | 46.16 | .00 | .00 |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | .00 | .00 | .00 | .00 | .00 |
| SUSP | .00 | .00 | 46.16- | 46.16 | .00 |
| SC/PAYEE | | | ✕ | ✕ | |

```
PAGE 007 OF 008    TOTAL TRANS AVAILABLE 0039   OLDEST TRAN 02-09-10 ⁄P
```

```
P309  LN▓▓▓▓▓▓▓▓            MORTGAGE LOAN HISTORY                    02-21-11

NAME ML HUTCHESO          INV-LN▓▓▓▓▓▓▓▓▓▓▓▓ DUE 04-15-10 TYPE 13-A

BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB      220,096.31  2ND PB          .00

HUD       .00   NET     1130.07  SF .00000000 SUSP      .00 STOP D B P F N A D L

REP       .00   RES        .00                            2 0 0 0 1 3 0

  APP              04-30           04-02          04-01          04-01          04-01
  DUE              03-10           03-10          03-10          03-10          02-10
  TYPE/TRAN       1   52          1   73         1   72         4   93         1   72
  AMOUNT            .00             .00          46.16            .00       1,130.07
  PRIN-PD          .00             .00            .00            .00         388.27
  PRIN-BAL    220,498.01      220,498.01     220,498.01     220,498.01     220,498.01
  INT-PD           .00             .00            .00            .00         534.91
  ESC-PD           .00             .00            .00            .00         206.89
  ESC-BAL       230.16          230.16         230.16         230.16         230.16
  A&H-INS          .00             .00            .00            .00            .00
  LIFE-INS         .00             .00            .00            .00            .00
  LC/FEES    1    46.16- 1      46.16            .00            .00            .00
  MISC-PD          .00             .00            .00            .00            .00
  ADV-BAL          .00             .00            .00            .00            .00
  SUSP             .00           46.16-         46.16            .00            .00
  SC/PAYEE                          ⊠              ⊠              ⊠

PAGE 006 OF 008     TOTAL TRANS AVAILABLE 0039    OLDEST TRAN 02-09-10 ∠P
```

```
P309 LN ▓▓▓▓▓▓▓         MORTGAGE LOAN HISTORY              02-21-11
NAME ML HUTCHESO          INV-LN ▓▓▓▓▓▓▓▓▓    DUE 04-15-10 TYPE 13-A
BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB   220,096.31 2ND PB       .00
HUD      .00  NET    1130.07 SF .00000000 SUSP      .00 STOP D B P F N A D L
REP      .00  RES       .00                              2 0 0 0 1 3 0
```

| | | | | | |
|---|---|---|---|---|---|
| APP | 05-22 | 05-21 | 05-14 | 05-14 | 05-14 |
| DUE | 04-10 | 05-10 | 04-10 | 04-10 | 03-10 |
| TYPE/TRAN | 1  61 | 3  12 | 1  73 | 4  93 | 1  72 |
| AMOUNT | 497.90 | 934.95- | 46.16 | .00 | 1,130.07 |
| PRIN-PD | .00 | .00 | .00 | .00 | 401.70 |
| PRIN-BAL | 220,096.31 | 220,096.31 | 220,096.31 | 220,096.31 | 220,096.31 |
| INT-PD | .00 | .00 | .00 | .00 | 521.48 |
| ESC-PD | 497.90 | 934.95- | .00 | .00 | 206.89 |
| ESC-BAL | .00 | 497.90- | 437.05 | 437.05 | 437.05 |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES | .00 | .00  1 | 46.16 | .00 | .00 |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | 497.90 | .00 | .00 | .00 | .00 |
| SUSP | .00 | .00 | .00 | .00 | .00 |
| SC/PAYEE | | 05069 | | ⋇ | ⋇ |

```
PAGE 005 OF 008    TOTAL TRANS AVAILABLE 0039   OLDEST TRAN 02-09-10 ∠P
```

```
P309 LM[redacted]                MORTGAGE LOAN HISTORY                      02-21-11
NAME ML HUTCHESO              INV-LN[redacted]         DUE 04-15-10 TYPE 13-A
BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB      220,096.31  2ND PB          .00
HUD      .00  NET    1130.07  SF .00000000 SUSP        .00 STOP D B P F N A D L
REP      .00  RES         .00                          2 0 0 0 1 3 0
```

| | | | | | |
|---|---|---|---|---|---|
| APP | 09-30 | 08-30 | 07-30 | 06-30 | 05-31 |
| DUE | 04-10 | 04-10 | 04-10 | 04-10 | 04-10 |
| TYPE/TRAN | 1  52 | 1  52 | 1  52 | 1  52 | 1  52 |
| AMOUNT | .00 | .00 | .00 | .00 | .00 |
| PRIN-PD | .00 | .00 | .00 | .00 | .00 |
| PRIN-BAL | 220,096.31 | 220,096.31 | 220,096.31 | 220,096.31 | 220,096.31 |
| INT-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-BAL | .00 | .00 | .00 | .00 | .00 |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES 1 | 46.16- 1 | 46.16- 1 | 46.16- 1 | 46.16- 1 | 46.16- |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | 497.90 | 497.90 | 497.90 | 497.90 | 497.90 |
| SUSP | .00 | .00 | .00 | .00 | .00 |
| SC/PAYEE | | | | | |

```
PAGE 004 OF 008    TOTAL TRANS AVAILABLE 0039    OLDEST TRAN 02-09-10 /P
```

```
  P309 LN▓▓▓▓▓▓▓▓▓           MORTGAGE LOAN HISTORY                        02-21-11
NAME ML HUTCHESO               INV-LN ▓▓▓▓▓▓▓▓▓▓▓     DUE 04-15-10 TYPE 13-A
BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB    220,096.31  2ND PB          .00
HUD      .00  NET    1130.07  SF .00000000 SUSP        .00 STOP D B P F N A D L
REP      .00  RES        .00                                  2 0 0 0 1 3 0
  APP          12-13          11-30          11-15          10-30          10-11
  DUE          00-00          04-10          00-00          04-10          00-00
  TYPE/TRAN    6   31        1   52         6   31         1   52         6   31
  AMOUNT         .00            .00            .00            .00            .00
  PRIN-PD        .00            .00            .00            .00            .00
  PRIN-BAL  220,096.31     220,096.31     220,096.31     220,096.31     220,096.31
  INT-PD         .00            .00            .00            .00            .00
  ESC-PD         .00            .00            .00            .00            .00
  ESC-BAL        .00            .00            .00            .00            .00
  A&H-INS        .00            .00            .00            .00            .00
  LIFE-INS       .00            .00            .00            .00            .00
  LC/FEES        .00   1     46.89-           .00   1     46.16-           .00
  MISC-PD        .00            .00            .00            .00            .00
  ADV-BAL     497.90         497.90         497.90         497.90         497.90
  SUSP           .00            .00            .00            .00            .00
  SC/PAYEE   PIUNIV                        PIUNIV                        PIUNIV

PAGE 003 OF 008    TOTAL TRANS AVAILABLE 0039    OLDEST TRAN 02-09-10 ∠P
```

```
 P309  L██████████████         MORTGAGE LOAN HISTORY                     02-21-11
NAME ML HUTCHESO            INV-LN ████████████████ DUE 04-15-10 TYPE 13-A
BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB    220,096.31  2ND PB         .00
HUD      .00  NET    1130.07  SF .00000000 SUSP        .00 STOP D B P F N A D L
REP      .00  RES      .00                                    2 0 0 0 1 3 0
```

| | | | | | |
|---|---|---|---|---|---|
| APP | 01-10 | 01-04 | 12-30 | 12-22 | 12-21 |
| DUE | 00-00 | 00-00 | 04-10 | 04-10 | 08-10 |
| TYPE/TRAN | 6  31 | 6  33 | 1  52 | 1  61 | 3  51 |
| AMOUNT | .00 | .00 | .00 | 1,741.00 | 1,741.00- |
| PRIN-PD | .00 | .00 | .00 | .00 | .00 |
| PRIN-BAL | 220,096.31 | 220,096.31 | 220,096.31 | 220,096.31 | 220,096.31 |
| INT-PD | .00 | .00 | .00 | .00 | .00 |
| ESC-PD | .00 | .00 | .00 | 1,741.00 | 1,741.00- |
| ESC-BAL | .00 | .00 | .00 | .00 | 1,741.00- |
| A&H-INS | .00 | .00 | .00 | .00 | .00 |
| LIFE-INS | .00 | .00 | .00 | .00 | .00 |
| LC/FEES | .00 | .00  1 | 46.89- | .00 | .00 |
| MISC-PD | .00 | .00 | .00 | .00 | .00 |
| ADV-BAL | 2,238.90 | 2,238.90 | 2,238.90 | 2,238.90 | 497.90 |
| SUSP | .00 | .00 | .00 | .00 | .00 |
| SC/PAYEE | PIUNIV | FCOT001 | | | ASPOL |

```
PAGE 002 OF 008    TOTAL TRANS AVAILABLE 0039   OLDEST TRAN 02-09-10 ∠P
```

```
P309 LN████████████        MORTGAGE LOAN HISTORY                    02-21-11

NAME ML HUTCHESO              INV-LN██████████████   DUE 04-15-10 TYPE 13-A

BR 43 MAN B P-TYPE 1 INT .0275700 FIRST PB      220,096.31  2ND PB        .00

HUD      .00   NET    1130.07  SF .00000000 SUSP        .00 STOP D B P F N A D L

REP      .00   RES       .00                                2 0 0 0 1 3 0

   APP            02-21          02-12          02-12          02-11          01-31

   DUE            00-00          04-10          00-00          02-11          04-10

   TYPE/TRAN     6   30       1    61        6    31        3    12        1    52

   AMOUNT           .00        968.45            .00        968.45-            .00

   PRIN-PD          .00            .00            .00            .00            .00

   PRIN-BAL   220,096.31     220,096.31     220,096.31     220,096.31     220,096.31

   INT-PD           .00            .00            .00            .00            .00

   ESC-PD           .00        968.45            .00        968.45-            .00

   ESC-BAL          .00            .00        968.45-        968.45-            .00

   A&H-INS          .00            .00            .00            .00            .00

   LIFE-INS         .00            .00            .00            .00            .00

   LC/FEES          .00            .00            .00            .00   1      46.89-

   MISC-PD          .00            .00            .00            .00            .00

   ADV-BAL     3,207.35       3,207.35       2,238.90       2,238.90       2,238.90

   SUSP             .00            .00            .00            .00            .00

   SC/PAYEE   FCAT051904                    PIUNIV         05069

PAGE 001 OF 008    TOTAL TRANS AVAILABLE 0039    OLDEST TRAN 02-09-10 ∠P
```

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT<sup>sm</sup> LOAN

### CERTIFICATES OF DEPOSIT INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER          DATE: **September 28, 2007**

BORROWER(S). **MARTIN L HUTCHESON, AN UNMARRIED MAN**    sometimes called "Borrower" and sometimes simply called "I" or "me "

PROPERTY ADDRESS· **2814 SUNSTONE DR, FORT COLLINS, CO  80525-5690**

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U S  **$217,600.00** , called "Principal," plus interest, and any other charges incurred during the course of the loan, to the order of the Lender  The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES,** or anyone to whom this Note is transferred

### 2.  INTEREST

**(A)    Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid   I will pay interest at the yearly rate of **7.683%.** The interest rate I will pay  may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)    Interest Change Dates**

The interest rate I will pay may change on the **15th** day of **November, 2007** and on the same day every month thereafter  Each date on which my interest rate could change is called an "Interest Change Date " The new rate of interest will become effective on each Interest Change Date

**(C)    Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%,** called "Lifetime Rate Cap "







**(D)  Index**
Beginning with the first Interest Change Date, my interest rate will be based on an "Index"  The Index is the average of the last twelve calendar months' most recently published monthly yields on 3-month certificates of deposit (secondary market) as published by the Federal Reserve Board. Lender will calculate the average by adding the twelve most recently published yields together and dividing the result by twelve  Lender will round the result of this division to the nearest one-thousandth of one percentage point (0.001%) by using the following convention  if the value of the 10,000th place is five or greater, the value of the 1,000th place will round up, if the value of the 10,000th place is less than five, the 1,000th place will not change. The most recent Index figure available on each Interest Change Date is called the "Current Index"  For purposes of determining the Index, "published" means first made available to the public by the Federal Reserve Board

**(E)  Calculation of Interest Rate Changes**
Lender will calculate my new interest rate by adding **2.350** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date  Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)  Alternative Index**
The Lender may choose an alternative index to be the Index if the Index is no longer available  For purposes of this Section 2(F), the Index is not "available" if  (a) the Index is for any reason no longer published, or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note  The selection of the alternative index shall be at Lender's sole discretion  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator  The Lender will give me notice of the alternative index.

**3.  PAYMENTS**
**(A)   Time and Place of Payments**
I will pay Principal and interest by making payments every month
I will make my monthly payments on the **15th** day of each month beginning on **November 15, 2007**. I will make these payments every month until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument  If, on **October 15, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender

**(B)   Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of US  $ **798.87**  This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance

**(C)   Payment Change Dates**
My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **November, 2008** and on that day every **12th** month thereafter  Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below

**(D)   Calculation of Payment Changes**
Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, together with interest at the interest rate in effect on the day of calculation by the Maturity Date  However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and Interest payment  This 7-1/2% limitation is called the "Payment Cap"  The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date



**(E)   Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due  If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap " If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal  Balance  Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment  Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)   Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply  Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)   Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law

**4.  FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal

**5.  BORROWER'S RIGHT TO PREPAY**

**6.  MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me  The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me  If a refund reduces Principal, the reduction will be treated as a partial Prepayment

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender  The amount of the charge will be **5.00%** of my overdue payment of Principal and interest  I will pay this late charge promptly but only once on each late payment





**(B)   Default**
I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading

**(C)   Notice of Default**
If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument

**(D)   No Waiver by Lender**
Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time

**(E)   Payment of Lender's Costs and Expenses**
The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law  Those expenses may include, for example, reasonable attorneys' fees and court costs

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **2814 SUNSTONE DR, FORT COLLINS, CO 80525-5690**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement   I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note  The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note

**10.   WAIVERS**
I and any other person who has obligations under this Note waive the rights of presentment, notice of dishonor, notice of acceleration, and protest  "Presentment" means the right to require the Lender to demand payment of amounts due  "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid

**11.   SECURED NOTE - ACCELERATION**
In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration  If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

SD253D (2006-09-3)                    ADJUSTABLE PICK-A-PAYMENT NOTE                    CO
                                                  Page 4



**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if

      (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

      (ii)    Lender approves the creditworthiness of the transferee in writing,

      (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards,

      (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

      (v)    the transferee executes an assumption agreement which is satisfactory to Lender

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes

### 12.  GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

### 13.  CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error

### 14.  LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS**

**SIGNATURE PAGE**

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

BORROWER(S):

_____  (Seal)
MARTIN L HUTCHESON

RECORDING REQUESTED BY:
WORLD SAVINGS BANK

WHEN RECORDED MAIL TO:
WORLD SAVINGS BANK
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

LOAN NUMBER

NOTE AMOUNT: $217,600.00

Received

OCT 1 5 2007

Candice Valentino

RECEPTION#: 20070075884, 10/04/2007 at
01:13:50 PM,
1 OF 13, R $66.00 TD Pgs: 0
Scott Doyle, Larimer County, CO

FOR RECORDER'S USE ONLY

## DEED OF TRUST

**THIS IS A FIRST DEED OF TRUST WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR MONTHLY PAYMENTS OF PRINCIPAL AND INTEREST.**

**THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS DEED OF TRUST IS $272,000.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.**

I.      DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST
     (A)    **Security Instrument.** This Deed of Trust, which is dated **September 28, 2007** will be called the "Security Instrument."

     (B)    **Borrower. MARTIN L HUTCHESON, AN UNMARRIED MAN**

sometimes will be called "Borrower" and sometimes simply "I" or "me."

     (C)    **Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES,** will be called "Lender." Lender is a **FEDERAL SAVINGS BANK,** which is organized and exists under the laws of the United States. Lender's address is **1901 Harrison Street, Oakland, CA 94612** .

     (D)    **Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$217,600.00** ("Note Amount"), plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay the debt in full by **October 15, 2037** .

     (E)    **Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

     (F)    **Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

     (G)    **Person.** Any person, organization, governmental authority or other party will be called "Person."

SD004A (2004-12-2)
DEFERRED INTEREST



CO

Security
Title

Page



LENDER'S USE ONLY



(H)    Trustor, Beneficiary, Trustee. Borrower is the "Trustor," Lender is the "Beneficiary" and the Public Trustee of LARIMER County, is the "Trustee."

**II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY**
I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with a power of sale subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender and Trustee those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who are beneficiaries of a deed of trust and to trustees of a deed of trust. I am giving Lender and Trustee these rights to protect Lender from possible losses that might result if I fail to:

(i)    pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

**III.    DESCRIPTION OF THE PROPERTY**
I give Trustee rights in the Property described below:

(i)    The property which is located at 2814 SUNSTONE DR, FORT COLLINS, CO 80525-5690. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)    All buildings and other improvements that are located on the Described Property;

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

**IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY**
I promise that: (i) I lawfully own the Property; (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and the Trustee has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

SD004B (2004-12-2)

Page 2

CO



## COVENANTS

I promise and I agree with Lender as follows.

**1.    BORROWER'S PROMISE TO PAY**
I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

**2.    PAYMENTS FOR TAXES AND INSURANCE**

**(A)    Borrower's Obligations**

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

**(B)    Escrow Accounts**

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all Sums Secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case, I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

Upon payment in full of all Sums Secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 27, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the Sums Secured by this Security Instrument.



**3.     APPLICATION OF BORROWER'S PAYMENTS**

Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes.

First, to pay prepayment charges due under the Secured Notes;
Second, to pay any advances due to Lender under this Security Instrument;
Third, to pay the amounts due to Lender under Paragraph 2 above;
Fourth, to pay interest due under the Secured Notes;
Fifth, to pay deferred interest due under the Secured Notes;
Sixth, to pay principal due under the Secured Notes;
Last, to pay late charges due under the Secured Notes.

**4.     BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien**. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.     BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.



If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 27 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any Proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those Proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6.    BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

7.    LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5, above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

8.    LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

9.    AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender.

SD004E (2004-12-2)

CO



If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

**10.   CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**

**(A)   Borrower's Obligations**

Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

**(B)   Lender's Rights**

Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 27 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Secured Notes and under this Security Instrument.

**11.   OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**12.   MAXIMUM LOAN CHARGES**

If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.



**13.    LEGISLATION AFFECTING LENDER'S RIGHTS**

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

**14.    NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **2814 SUNSTONE DR, FORT COLLINS, CO 80525-5690.** A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used In This Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15.    GOVERNING LAW; SEVERABILITY**

This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions, ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located. In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

**16.    BORROWER'S COPY**

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

**17.    LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may. (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B), enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 27, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold, (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds

**18.    INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**

An **assignment** is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by



applicable law, to Lender  Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe to Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

**19.    CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.    LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.    WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.    CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.    MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.    CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

(A)    If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

(B)    The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above

(C)    If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, **a master or blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such **master or blanket** policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master or blanket** policy to Lender annually.



In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

(D)   I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master** or **blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**25.   FUTURE ADVANCES**

At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

**26.   AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

<u>Exception to Acceleration of Payment of Sums Secured.</u> If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)   Lender approves the creditworthiness of the transferee in writing;

(iii)  transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)   an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)    the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.



**27.   RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, the Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed under the Applicable Law to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken upon ex parte application, and without prior notice to me, notice being expressly waived by me, and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender except as limited or prohibited by the Applicable Law. If the Property is sold under the Applicable Law, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property, except to the extent that the Applicable Law limits or prohibits any such charges.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**28.   LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**

When Lender has been paid all of the amounts secured by this Security Instrument, Lender shall release or cancel this Security Instrument and I will pay all costs incurred.

**29.   STATEMENT OF OBLIGATION**

To the extent allowed by law, I will give Lender a fee for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

**30.   WAIVER OF HOMESTEAD**

My right to any applicable homestead exemption in the Property is waived.

**31.   RIDERS TO THIS SECURITY INSTRUMENT**

If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.



SD004J (2004-12-2)                    Page 10                                CO

**32.    ( x )   QUICK QUALIFYING LOAN PROGRAM**

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**33.    ( x )   OWNER OCCUPANCY**

Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

**( X )   VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_____ (Seal)

MARTIN D. HUTCHESON

STATE OF COLORADO
COUNTY OF LARIMER

THE FOREGOING INSTRUMENT WAS ACKNOWLEDGED BEFORE ME
THIS 28TH DAY OF SEPTEMBER, 2007 BY
MARTIN L. HUTCHESON

DEBBIE POOL
NOTARY PUBLIC
STATE OF COLORADO
My Commission Expires: 25/2010

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**



# EXHIBIT A

Lot 32, English Ranch South, P.U.D., Second Filing, County of Larimer, State of Colorado.

Also known by street address as:  **2814 Sunstone Drive, Fort Collins, CO  80525**

EXHIBITA
Exhibit A – Legal Description





Comptroller of the Currency
Administrator of National Banks

---

Large Bank Licensing, MS 7-13
250 E Street, S.W.
Washington, DC 20219

September 14, 2007

**Corporate Decision #2007-08**
**December 2007**

Mr. John A. Stoker
Vice President and
Assistant General Counsel
Wachovia Corporation
Legal Division NC0630
One Wachovia Center
301 South College Street
Charlotte, NC 28288

Re:   Application by Wachovia Bank of Delaware, National Association, Wilmington,
      Delaware, to purchase and assume certain assets and liabilities of World Savings Bank,
      FSB (Texas), Houston, Texas
      Application Control Number:  2007-ML-02-0010

Dear Mr. Stoker:

The Office of the Comptroller of the Currency ("OCC") hereby approves the application
submitted by Wachovia Bank of Delaware, National Association ("WBDNA"), Wilmington,
Delaware, to purchase certain assets and assume certain liabilities of its affiliate, World Savings
Bank, FSB (Texas) ("World-TX"), Houston, Texas.  This approval is granted after a thorough
review of the application, the purchase and assumption agreement, other materials you have
supplied, and other information available to the OCC, including commitments and
representations made in the application and by the applicants' representatives during the
application process.

**The Transaction**

WBDNA is an insured national bank with its main office in Wilmington and branches
throughout Delaware.  World-TX is an insured federal savings association with its main office in
Houston; it does not have any branch offices.  WBDNA is not acquiring any offices in Texas in
this transaction.  World-TX will continue to operate after the transaction.

The proposed purchase and assumption transaction is legally authorized. National banks have long been authorized to purchase bank-permissible assets and assume bank-permissible liabilities from other institutions, including assuming the deposit liabilities from other institutions, as part of their general banking powers under 12 U.S.C. § 24(Seventh). *See, e.g., City National Bank of Huron v. Fuller*, 52 F.2d, 870, 872-73 (8th Cir. 1931); *In re Cleveland Savings Society,* 192 N.E.2d 518, 523-24 (Ohio Com. Pl. 1961). *See also* 12 U.S.C. *§* 1828(c) (purchase and assumption transactions included among transactions requiring review under the Bank Merger Act). Such purchase and assumption transactions are commonplace in the banking industry. No nonconforming or impermissible assets or activities will be acquired by WBDNA.

Accordingly, WBDNA may purchase the assets, and assume the liabilities, of World-TX under 12 U.S.C. § 24(Seventh). Since WBDNA is not acquiring any branch from World-TX, no further authority legal authority is required for this transaction. The OCC approves the purchase and assumption.

**Bank Merger Act and Community Reinvestment Act Reviews**

The OCC reviewed the proposed purchase and assumption transaction under the criteria of the Bank Merger Act, 12 USC 1828(c), and applicable OCC regulations and policies. Among other matters, we found that the proposed transaction would not have significant anticompetitive effects. The OCC considered the financial and managerial resources of the banks, their future prospects, the convenience and needs of the communities to be served, and their effectiveness in combating money laundering activities. We considered these factors and found them consistent with approval.

The OCC also reviewed the purchase and assumption transaction under the Community Reinvestment Act ("CRA"). The CRA requires the OCC to take into account the applicants' record of helping to meet the credit needs of the community, including low- and moderate-income ("LMI") neighborhoods, when evaluating certain applications, including transactions that are subject to the Bank Merger Act. 12 U.S.C. § 2903; 12 C.F.R. § 25.29. The OCC considers the CRA performance evaluation of each institution involved in the transaction. A review of the record of these applicants and other information available to the OCC as a result of its regulatory responsibilities revealed no evidence that the applicants' record of helping to meet the credit needs of their communities, including LMI neighborhoods, is less than satisfactory.

**Consummation Requirements**

The OCC must be advised in writing in advance of the desired effective date for the purchase and assumption so that the OCC may issue the certification letter. The OCC will issue a letter certifying consummation of the purchase and assumption when we receive:

- A Secretary's Certificate for each institution certifying that a majority of the board of directors approved the purchase and assumption.

- An executed Purchase and Assumption Agreement between WBDNA and World-TX.

**Conclusion**

If the purchase and assumption is not consummated within one year from the approval date, the approval shall automatically terminate, unless the OCC grants an extension of the time period.

This approval, and the activities and communications by OCC employees in connection with the filing, do not constitute a contract, express or implied, or any other obligation binding upon the OCC, the United States, any agency or entity of the United States, or any officer or employee of the United States, and do not affect the ability of the OCC to exercise its supervisory, regulatory, and examination authorities under applicable law and regulations.  The foregoing may not be waived or modified by any employee or agent of the OCC or the United States.

All correspondence regarding this application should reference the application control number. If you have any questions, please contact me at (202)874-5294 or by e-mail at Stephen.Lybarger@occ.treas.gov.

Sincerely,

*Stephen A. Lybarger*

Stephen A. Lybarger
Large Bank Licensing Lead Expert

Enclosure:  Survey Letter



Comptroller of the Currency
Administrator of National Banks

Large Bank Licensing

November 1, 2009

Mr. James E. Hanson
Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re:    Application to convert Wachovia Mortgage, FSB, North Las Vegas, Nevada to a national
       bank and application to merge the converted bank with and into Wells Fargo Bank,
       National Association, Sioux Falls, South Dakota
       Application Control Numbers:  2009-ML-01-0007 and 2009-ML-02-0010

Dear Mr. Hanson:

This letter is the official certification of the Comptroller of the Currency (OCC) of the
conversion of Wachovia Mortgage FSB, North Las Vegas, Nevada to a national bank with the
name Wells Fargo Bank Southwest, National Association, effective November 1, 2009.  This is
also the official certification to merge Wells Fargo Bank Southwest, National Association with
and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota, effective
November 1, 2009.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by email at:
Stephen.Lybarger@occ.treas.gov .  Please reference the application control number or numbers
in any correspondence.

Sincerely,

*Stephen A. Lybarger*

Stephen A. Lybarger
Large Bank Licensing Lead Expert

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

*In Re*:                                                                                        Chapter 7
Case No. 11-12805-ABC

MARTIN L. HUTCHESON,  **Debtor,**

WELLS FARGO BANK, N.A., Successors, Assigns, Servicers, Investors and Trustees, **Movant**.

_____

## AFFIDAVIT OF MILITARY SERVICE

_____

STATE OF COLORADO                )
                                                          ) ss.
CITY AND COUNTY OF DENVER    )

        I, Tyler Clarke, being first duly sworn, depose and state as follows:

1.        I am over 18 years of age and competent to testify in this matter.

2.        I am an employee of the law firm of Aronowitz & Mecklenburg, LLP.

3.        On Feb 22, 2011, I, Tyler Clarke,  performed a search using the Department of Defense Manpower Data Center.  According to the Department of Defense Manpower Data Center, the Department of Defense Manpower Data Center does not possess any information indicating that the Debtor, Martin L. Hutcheson,  is currently on active duty as to any of the branches of the United States military.  A true and correct copy of the Department of Defense Manpower Data Center Military Status Report is attached hereto.

Dated: Feb 22, 2011.                                            *Original signature on file*

/s/ *Tyler Clarke*

The foregoing was subscribed and sworn to before me on February 22, 2011

WITNESS MY HAND AND OFFICIAL SEAL.

My commission expires:___April 15, 2013___

*Original signature on file*

_____
Notary Public

-3-

Department of Defense Manpower Data Center                    Feb-22-2011 09:44:01



Military Status Report
Pursuant to the Service Members Civil Relief Act

| ◄ Last Name | First/Middle | Begin Date | Active Duty Status | Active Duty End Date | Service Agency |
|---|---|---|---|---|---|
| HUTCHESON | MARTIN | Based on the information you have furnished, the DMDC does not possess any information indicating the individual status. | | | |

Upon searching the information data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the current status of the individual as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard).

*Mary M. Snavely-Dixon*

_____

Mary M. Snavely-Dixon, Director
Department of Defense - Manpower Data Center
1600 Wilson Blvd., Suite 400
Arlington, VA 22209-2593

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Service Members Civil Relief Act (50 USC App. §§ 501 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual is on active duty, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service via the "defenselink.mil" URL http://www.defenselink.mil/faq/pis/PC09SLDR.html. If you have evidence the person is on active duty and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. §521(c).

If you obtain additional information about the person (e.g., an SSN, improved accuracy of DOB, a middle name), you can submit your request again at this Web site and we will provide a new certificate for that query.

This response reflects **active duty status** including date the individual was last on active duty, if it was within the preceding 367 days. For historical information, please contact the Service SCRA points-of-contact.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

*In Re*:
                                                 Chapter 7
                                    Case No. 11-12805-ABC

MARTIN L. HUTCHESON, **Debtor,**

WELLS FARGO BANK, N.A., Successors, Assigns, Servicers, Investors and Trustees, **Movant**

vs.

MARTIN L. HUTCHESON,   and DANIEL A. HEPNER, Trustee,   **Respondents.**

---

## NOTICE OF MOTION FOR RELIEF FROM STAY AND OPPORTUNITY FOR HEARING PURSUANT TO 11 U.S.C.  SECTION 362 (d)

---

OBJECTION DEADLINE: **March 17, 2011**.

YOU ARE HEREBY NOTIFIED that a Motion for Relief from Stay has been filed, a copy of which is attached hereto.

A hearing on the motion has been set for **March 24, 2011 at 9:00 A.M. at the U.S. Bankruptcy Court, U.S. Custom House, 721 19th Street, Courtroom C, Fifth Floor, Denver, Colorado 80202.**  The hearing will be conducted in accordance with the provisions of L.B.R. 4001-1.

IF YOU DESIRE TO OPPOSE THIS MOTION, you must file with this court a WRITTEN OBJECTION to the motion on or before the objection deadline listed above and serve a copy upon movant's attorney, whose address is listed below.

If you file an objection, you are REQUIRED to comply with L.B.R. 4001-1 regarding hearing procedures, including (1) the timely submission and exchange of witness lists and exhibits and (2) attendance at the above-scheduled hearing in person or through counsel, if represented.

**IF YOU FAIL TO FILE AN OBJECTION,** the scheduled hearing will be **vacated**, and an order granting the relief requested may be granted without further notice to you.

DATED:  February 22, 2011.

ARONOWITZ &  MECKLENBURG, LLP

E-FILED ORIGINAL
Date:  Feb 22, 2011
Document to be
retained in file of
Susan J. Hendrick

Susan J. Hendrick, No. 33196
Stacey L. Aronowitz, No. 36290
Monica Kadrmas, No. 34904
Andrea Rickles-Jordan, No. 39005
1199 Bannock Street
Denver, Colorado   80204
Telephone:  (303) 813-1177
Telecopier:  (303) 813-1107
Email Address:  bk@amlawco.com

CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2011, true and correct copies of a Motion for Relief From Automatic Stay (including Exhibits) concerning Property commonly known as 2814 SUNSTONE DR, FORT COLLINS, CO 80525-5690; Notice of Hearing, Preliminary Hearing, or Entry of Order Pursuant to Local Bankruptcy Rule 4001; Certificate of Service;  and Affidavit Concerning Military Status were deposited into the United States mail, first class, postage prepaid and addressed to the following:

James L. Leerssen
1416 Grand Ave.
Windsor, CO 80550-5815

Daniel A. Hepner
9101 Harlan Street, Suite 260
Westminster, CO 80031

Martin L. Hutcheson
2814 Sunstone Dr.
Fort Collins, CO 80525

U. S. Trustee
*By electronic notice only per written request

/s/ Tyler Clarke